GROGAN, COLLECTOR OF INTERNAL REVENUE FOR THE FIRST DISTRICT OF MICHIGAN, ET AL. *v.* HIRAM WALKER & SONS, LTD.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES .FOR THE EASTERN DISTRICT OF MICHIGAN.

ANCHOR LINE (HENDERSON BROTHERS), LTD. *v.* ALDRIDGE, COLLECTOR OF CUSTOMS FOR THE PORT OF NEW YORK.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 615, 639.   Argued April 19, 1922.—Decided May 15, 1922.

The transportation in bond from Canada through the United States of whisky intended as a beverage, destined to a foreign country, and transshipment of whisky from one British ship to another in a port of the United States, are forbidden by the Eighteenth Amendment and the National Prohibition Act, which, in this regard, supersede the provisions of Rev. Stats., § 3005, as amended, and Art. XXIX of the Treaty with Great Britain of May 8, 1871, (if it was not previously abrogated), authorizing transit of foreign merchandise through this country without payment of duty. P. 88.

275 Fed. 373, (No. 615), reversed.
No. 639, affirmed.

APPEALS from decrees of the District Court, the first granting, and the second refusing, an injunction, in suits to prevent interference with transportation and transshipment of whisky.

*Mr. Assistant to the Attorney General Goff,* with whom *Mr. Abram F. Myers,* Special Assistant to the Attorney General, was on the brief, for appellants in No. 615 and appellee in No. 639.

The Eighteenth Amendment and the Prohibition Act apply to and prohibit the transshipment of intoxicating liquors for beverage purposes in or through the United States.

While the ultimate object is the prevention of the use, the immediate purpose is the destruction of all traffic in or dealing with the interdicted commodities.

This follows from the language employed. Neither the amendment nor the act in terms forbids the use of intoxicating liquors; they are concerned merely with the incidents of ownership, such as the manufacture, sale, transportation, possession, etc. *Street* v. *Lincoln Safe Deposit Co.,* 254 U. S. 88, 95.

The reason for this is that a more effective method of eradicating the evil of use is by preventing the means by which it comes into being, than by direct inhibition on the use.

The amendment and the act clearly were intended to prohibit the possession or transportation of liquor for beverage purposes, whether for consumption within the United States or without. It is impossible to understand why the proviso exempting liquor in transit through the Panama Canal was made in § 20, Title III, while no similar clause was added to § 3, Title II, if Congress intended to exempt from the latter the transshipment of liquors.

Again, both the amendment and the act expressly prohibit the exportation of intoxicating liquors from the United States. Such prohibition is inconsistent with an intention to restrict their application to liquors intended for consumption in the United States. When the act was passed there were stored in bonded warehouses many millions of gallons of distilled spirits manufactured here strictly in accordance with law. Congress in forbidding the exportation of this legally acquired liquor could have been influenced only by apprehension of inevitable losses and diversions to unlawful uses attendant upon the transportation to seaboard.

The proceedings in Congress evidence the legislative intention to prohibit all possession and all transportation

9545°—23——6

except as specifically authorized. 58 Cong. Rec. 2449; Sen. Rep. 151; Title II, § 3. The transshipment or " in transit " conveyance of intoxicating liquor necessarily involves its " possession " as well as its " transportation."

*United States* v. *Gudger*, 249 U. S. 373, and *Street* v. *Lincoln Safe Deposit Co.*, 254 U. S. 88, distinguished.

Unlike *American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347, there is involved in the present cases no attempt to apply the laws of the United States to acts committed in a foreign country. Cf. *Strathearn S. S. Co.* v. *Dillon*, 252 U. S. 348.

The Prohibition Act, in its application to the transshipment of intoxicating liquor for beverage purposes, is constitutional. Congress in legislating for the enforcement of the amendment may provide all means reasonably necessary effectively to suppress the prohibited acts. *McCulloch* v. *Maryland*, 4 Wheat. 316, 421, 423; *Powell* v. *Pennsylvania*, 127 U. S. 678, 685; *Otis* v. *Parker*, 187 U. S. 606, 608, 609; *Public Clearing House* v. *Coyne*, 194 U. S. 497; *Purity Extract Co.* v. *Lynch*, 226 U. S. 192, 201; *Ruppert* v. *Caffey*, 251 U. S. 264. And because of their noxious qualities all traffic in or dealing with intoxicating liquor may be absolutely suppressed. *Crane* v. *Campbell*, 245 U. S. 304, 307, 308.

Plaintiffs have not by proper allegations brought themselves within Art. XXIX of the Treaty with Great Britain of 1871; but in any event that article has been abrogated.

Section 3005, Rev. Stats., conferred no affirmative rights with respect to the transshipment of merchandise. Assuming that it did, it was superseded by the Prohibition Act so far as shipments of liquor are concerned.

*Mr. Alfred Lucking* for appellee in No. 615.

The bill alleges a case under the Treaty with Great Britain of 1871. Article XXIX of that treaty is still in full force.

There is in the National Prohibition Act no express repeal of Rev. Stats., § 3005; nor has there been a repeal of that section by implication, so far as intoxicating liquors are concerned. There is no inconsistency between § 3005, permitting transshipments through the United States from one foreign country to another, and the National Prohibition Act, which aims to prevent the manufacture and sale and in part the use of intoxicating beverages within the United States. Both may stand and be enforced. Repeals by implication are not favored.

No doubt Congress may pass a law breaking down this treaty, *pro tanto,* and withdrawing the rights which have so long obtained under it; but treaty rights should be regarded as inviolable and not be held to be impaired by subsequent legislation unless the intention of Congress is perfectly clear. *Chew Heong* v. *United States,* 112 U. S. 540, 549; *Frost* v. *Wenie,* 157 U. S. 59; *United States* v. *Gue Lim,* 176 U. S. 464; *United States* v. *Lee Yen Tai* 185 U. S. 221; *Johnson* v. *Browne,* 205 U. S. 321.

The purpose of the Eighteenth Amendment and the Prohibition Act being to prohibit the use as a beverage within the United States, the prevention of shipping through in bond, duly sealed up and beyond the possibility of being used in the United States, is not within the spirit or purpose of either the amendment or the act. *United States* v. *Palmer,* 3 Wheat. 610; *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347.

Not being within the spirit or purpose of the act, the act will not be construed to include the case. *Faw* v. *Marsteller,* 2 Cr. 10; *Taylor* v. *United States,* 207 U. S. 120; *Holy Trinity Church* v. *United States,* 143 U. S. 457, 459; *American Security Co.* v. *District of Columbia,* 224 U. S. 491, 495; *Lau Ow Bew* v. *United States,* 144 U. S. 47, 61; *United States* v. *Palmer,* 3 Wheat. 610.

Bringing into the United States for transshipment through the United States to another foreign country is

not an "importation." 27 Ops. Atty. Gen. 440; *McLean v. Hager,* 31 Fed. 602, 604, 605; *The Conqueror,* 166 U. S. 110, 115; *United States* v. *85 Head of Cattle,* 205 Fed. 679; *The Concord,* 9 Cr. 387. The cases just cited are also authority that the sending out of the same goods is not an "exportation." See also *Kidd* v. *Flagler,* 54 Fed. 369; *Swan & Finch Co.* v. *United States,* 190 U. S. 143; 17 Ops. Atty. Gen. 583. Nor is transportation through the United States from one foreign country to another a "transportation within" the United States. *United States* v. *Gudger,* 249 U. S. 373; *Street* v. *Lincoln Safe Deposit Co.,* 254 U. S. 88.

The practice in question is a separate and distinct act, recognized by the statutes and in congressional and departmental proceedings since 1866, as "conveyance in transit" or "transit in bond." Counsel for the Government contend that all "possession" is forbidden by § 3 of the act, and hence this practice is banned. But this is not so. Under the "conveyance in transit" practice, the possession is constructively and actually the possession of the United States, through its customs officers and its bonded carriers. U. S. Comp. Stats., 1916, §§ 5695, 5698–5700; *Seeberger* v. *Schweyer,* 153 U. S. 612, 613; *Hartranft* v. *Oliver,* 125 U. S. 528, 530; *Harris* v. *Dennie,* 3 Pet. 303, 304; Treasury Regulations, 1915, Art. 695.

The provision expressly excepting transportation through the Panama Canal has no application here. It is not connected with or a part of the sections now being interpreted. The rule "*expressio unius*" is only an aid to discovering the legislative intent when not otherwise manifest. It is never hard and fast. *United States* v. *Barnes,* 222 U. S. 518, 519; *Dwight* v. *American Co.,* 263 Fed. 318; 36 Cyc. 1122.

*Mr. Lucius H. Beers,* with whom *Mr. Franklin B. Lord* and *Mr. Allen Evarts Foster* were on the brief, for appellant in No. 639.

The Eighteenth Amendment and the National Prohibition Act do not purport to apply to the use of intoxicating liquor outside of the United States.   It expressly appears from the amendment that it is to prevent the use of intoxicating liquors as a beverage only within the United States and territory subject to the jurisdiction thereof.

An intention ought not to be attributed to Congress to interfere with the use of liquor as a beverage outside of United States territory.   *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347; *Milliken* v. *Pratt,* 125 Mass. 374.

Where Congress has intended to prevent the transshipment in American ports of merchandise moving from one foreign country to another, it has expressly provided to that effect.

A thing may be within the letter of the statute and yet not within the statute because not within its spirit nor within the intention of its makers.   *Holy Trinity Church* v. *United States,* 143 U. S. 457, 458, 459; *Lau Ow Bew* v. *United States,* 144 U. S. 47, 61; *Taylor* v. *United States,* 207 U. S. 120.

The transshipment here involved is not " transportation " within the prohibition of the amendment or of the act.   *United States* v. *Gudger,* 249 U. S. 373; *Street* v. *Lincoln Safe Deposit Co.,* 254 U. S. 88.   Nor is it " importation " or " exportation," as these words have heretofore been defined by the federal courts.   *Swan & Finch Co.* v. *United States,* 190 U. S. 143, 144; *Flagler* v. *Kidd,* 78 Fed. 341, 344; *United States* v. *85 Head of Cattle,* 205 Fed. 679, 681; *The Concord,* 9 Cr. 387, 388; 27 Ops. Atty. Gen. 440.

Even if it could be held that the transshipment here involved amounts legally to " importation " or " exportation," such transshipment does not constitute " importation " or " exportation " within the prohibition of the amendment or of the act.   The Federal Government was seeking to prevent the use of alcoholic beverages by per-

sons subject to its jurisdiction. It is well known that this use of alcoholic beverages has been opposed partly on economic grounds, but also on moral grounds; and it would have put the United States in an unfortunate moral position if the amendment and act had still left it possible for Americans to ship to other countries beverages, the use of which was considered immoral and uneconomic in the United States. And it is therefore not surprising that the framers of the amendment and of the act made use of the words "exportation" and "export" so as to put the United States in a proper moral position in this regard.

The inherent character of this merchandise does not require its exclusion and Congress has provided that liquor may be imported for medicinal and other nonbeverage purposes.

A special federal statute has long existed permitting the transshipment in our ports of merchandise destined for a foreign country, and a general statute such as the Prohibition Act, does not repeal such a special statute "unless the repeal be expressed or the implication to that end be irresistible." Rev. Stats., § 3005. *Ex parte United States,* 226 U. S. 420; *Washington* v. *Miller,* 235 U. S. 422.

It is inherently improbable that Congress can have intended to prohibit these transshipments when it framed the Prohibition Act. These transshipments are not our commerce; our interference with them is an interference with the commerce of other nations; and we have every reason to assume that this interference will be resented and might well lead to action by foreign countries which would seriously affect American exports.

If the Prohibition Act be construed as prohibiting transshipments of the kind here involved, it is unconstitutional. It cannot be sustained under the commerce clause. *Trade-Mark Cases,* 100 U. S. 82, 96. A statute enacted pursuant to a constitutional amendment which

authorizes Congress to enact laws for the enforcement of the rights secured by such amendment, is void if it is broader than the amendment which it is designed to enforce. *United States* v. *Reese,* 92 U. S. 214; *Karem* v. *United States,* 121 Fed. 250. A construction prohibiting these transshipments ought, therefore, to be avoided.

Laws of Congress are always to be construed to conform to the provisions of a treaty, if possible to do so without violence to their language. Article XXIX of the Treaty of 1871 with Great Britain, providing for the transshipment of merchandise without the payment of duties, was not repealed in 1883, and is still in force. *United States* v. *43 Gallons of Whiskey,* 108 U. S. 491, 496; *Lem Moon Sing* v. *United States,* 158 U. S. 539, 549.

MR. JUSTICE HOLMES delivered the opinion of the court.

These cases raise the question whether the Constitution and the Volstead Act prohibit the transportation of intoxicating liquors from a foreign port through some part of the United States to another foreign port. The first is a bill by a corporation of Canada against the Collector of Customs and the Collector of Internal Revenue for the Eastern District of Michigan to prevent their carrying out the orders of the Treasury Department to stop the plaintiffs from shipping whiskey intended as a beverage from Canada by way of Detroit in bond through the United States to Mexico, Central or South America. The irreparable injury that will be done to the plaintiff's business is fully shown, and the decision depends on the single question stated above. An injunction was granted by the District Court. 275 Fed. 373. The second case is to prevent similar interference with the transshipment of whiskey from one British ship to another in the harbor of New York. Upon a consideration of the same general questions an injunction was refused by the District

Court for the Southern District of New York, October 21, 1921.

The plaintiffs rely upon Rev. Stats., § 3005, as amended, and Article XXIX of the treaty, concluded with Great Britain on May 8, 1871, 17 Stat. 863. By the former, an exemption in a revenue act, merchandise arriving at any port of the United States destined for any foreign country may be entered at the custom house and conveyed in transit through the territory of the United States, without the payment of duties, under such regulations as to examination and transportation as the Secretary of the Treasury may prescribe. See *United States* v. *Yuginovich,* 256 U. S. 450. By the treaty, for the term of years mentioned in Article XXXIII merchandise arriving at the ports of New York, Boston and Portland, and other ports specially designated by the President, and destined for British possessions in North America, may be entered at the customs house and may be conveyed in transit without the payment of duties through the territory of the United States under such rules, &c., as the Government of the United States may prescribe; and under like rules, &c., from such possessions through the territory of the United States for export from the said ports of the United States. President Cleveland and President Harrison in messages to Congress expressed the opinion that Article XXIX had been abrogated. In view of the parallelism between the statute and the treaty the question seems of no importance except so far as the existence of. the treaty might be supposed to intensify the reasons for construing later legislation as not overruling it. But makeweights of that sort are not enough to affect the result here.

On the other side is the Eighteenth Amendment forbidding " the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all

territory subject to the jurisdiction thereof for beverage purposes." There is also the National Prohibition Act of October 28, 1919, c. 85, Title II, § 3, 41 Stat. 305, 308, which provides that, except as therein authorized, after the Eighteenth Amendment goes into effect no person shall manufacture, sell, barter, transport, import, export, deliver, furnish or possess any intoxicating liquor. All the provisions of the act are to be liberally construed to the end that the use of intoxicating liquor as a beverage may be prevented.

The routine arguments are pressed that this country does not undertake to regulate the habits of people else-where and that the references to beverage purposes and use as a beverage show that it was not attempting to do so; that it has no interest in meddling with transportation across its territory, if leakage in transit is prevented, as it has been; that the repeal of statutes and a fortiori of treaties by implication is not to be favored; and that even if the letter of a law seems to have that effect a thing may be within the letter yet not within the law when it has been construed. We appreciate all this, but are of opinion that the letter is too strong in this case.

The Eighteenth Amendment meant a great revolution in the policy of this country, and presumably and obviously meant to upset a good many things on as well as off the statute book. It did not confine itself in any meticulous way to the use of intoxicants in this country. It forbade export for beverage purposes elsewhere. True this discouraged production here, but that was forbidden already, and the provision applied to liquors already lawfully made. See *Hamilton* v. *Kentucky Distilleries & Warehouse Co.,* 251 U. S. 146, 151, n. 1. It is obvious that those whose wishes and opinions were embodied in the Amendment meant to stop the whole business. They did not want intoxicating liquor in the United States and reasonably may have thought that if they let it in some

of it was likely to stay. When, therefore, the Amendment forbids not only importation into and exportation from the United States but transportation within it, the natural meaning of the words expresses an altogether probable intent. The Prohibition Act only fortifies in this respect the interpretation of the Amendment itself. The manufacture, possession, sale and transportation of spirits and wine for other than beverage purposes are provided for in the act, but there is no provision for transshipment or carriage across the country from without. When Congress was ready to permit such a transit for special reasons, in the Canal Zone, it permitted it in express words. Title III, § 20, 41 Stat. 322.

*Street* v. *Lincoln Safe Deposit Co.*, 254 U. S. 88, was decided on the ground that the liquors were in the strictest sense in the possession of the owner (254 U. S. 92, 93, see *Union Trust Co.* v. *Wilson*, 198 U. S. 530, 537), and that to move them from the warehouse to the dwelling was no more transportation in the sense of the statute than to take them from the cellar to the dining room; whereas in *Corneli* v. *Moore*, 257 U. S. 491, they were not in the owner's possession and required delivery and transportation to become so. In *United States* v. *Gudger*, 249 U. S. 373, the only point was that transportation through a State was not transportation into it within the meaning of the statute before the court. None of these cases has any bearing upon the question here. We are of opinion that the decree in *Grogan* v. *Hiram Walker & Sons, Ltd.*, should be reversed, and the decree in *The Anchor Line, Ltd.*, v. *Aldridge*, affirmed.

*615.    Decree reversed.*
*639.    Decree affirmed.*

MR. JUSTICE McKENNA, with whom concurred MR. JUSTICE DAY and MR. JUSTICE CLARKE, dissenting.

I am unable to concur in the opinion and judgment of the court.

The first case presents the right to transport intoxicating liquor in bond through the United States in accordance with certain rights given by the Revised Statutes and a treaty with Great Britain, notwithstanding the Eighteenth Amendment of the Constitution and its auxiliary legislation, the Volstead Act.

The second case concerns the transshipment of like liquor from one British ship to another British ship in New York harbor. In the first case it was decided that the right of transportation still exists. 275 Fed. 373. In the second case a prohibitive effect was ascribed to the Amendment and the legislation.

The factors of decision are the policies constituted by the amendment to the Constitution, the statute enacted in aid of it, other statutes preceding it, and a treaty of the United States with Great Britain. And their relation is to be determined, and range. What shall be the test of determination? The words of the instruments? These, indeed, may make individuality, and express purposes, but if the purposes collide, which must give way? And upon what considerations? It is the view of the court that the purposes do collide and the court assigns prevailing force to the Eighteenth Amendment and the Volstead Act—the reform they instituted having annulled § 3005 of the Revised Statutes as amended, and Article XXIX of the treaty with Great Britain, May 8, 1871.

I am unable to assent. The factors are not in antagonism but each has a definite purpose consistent with the purpose of every other.

I consider first the Eighteenth Amendment. Its provision is that one year from the date of its ratification, the manufacture, sale or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from, the United States and all territory subject to the jurisdiction thereof for beverage purposes, is prohibited.

It will be observed that the Amendment provides against the manufacture, sale and certain movements of intoxicating liquors. Those movements are its transportation within, its importation into, and its exportation from the United States. The last two may be put immediately out of consideration. The liquor in the cases at bar, neither in common nor legal sense, was an importation into the United States or exportation from it.[1] Importation and exportation are constituted of something more than ingress of the intoxicants, under bond, at one border of the country and egress, under bond, at another border, the purpose being for passage only through the country and having as impalpable effect upon it as if the passage were by airship. Still less, if I may suppose the impossible, is the transshipment of liquors in New York harbor from one British ship to another under the supervision of revenue officers, the importation or exportation of the liquors into or from the United States.

The other movement is a case of *transportation within the United States* in the literal sense of the words, but this court in *Street* v. *Lincoln Safe Deposit Co.,* 254 U. S. 88, has limited its apparent universality by accommodating it to conditions and preëxistent rights, and this against the executive and reforming zeal of a public officer sustained by the judgment of a District Court, thereby applying the rule, denominated by Mr. Justice Brewer as "familiar," and variously illustrated by him, in *Holy Trinity Church* v. *United States,* 143 U. S. 457, that a statute should not be taken at its word against its spirit, and intention. The rule has had illustration since and this court following it, and its sanction in common sense, declared

---

[1] 27 Ops. Atty. Gen. 440; *McLean* v. *Hager,* 31 Fed. 602; *The Conqueror,* 166 U. S. 110, 115; *United States* v. *85 Head of Cattle,* 205 Fed. 679; *The Concord,* 9 Cranch, 387; *Swan & Finch Co.* v. *United States,* 190 U. S. 143.

against the destructive revolution urged, based upon the literal meaning of words. The court decided that it was not " unlawful to have or possess " (the words of the Volstead Act) liquors, and that *transportation* thereof from a room leased in a public warehouse, where they were stored, to the dwelling house of the owner of them for consumption for himself and family was not adverse to the act or to the Eighteenth Amendment. The decision was only possible by rejecting the literal meaning of the words unlawful " to have or possess " intoxicating liquors or the " transportation " of them " within the United States " and accommodating those words to the spirit and intention of their use.

In *Corneli v. Moore,* 257 U. S. 491, a distinction between a room leased in a public warehouse and a public warehouse was made, and the *transportation* from the latter was decided to be prohibited. In other words, it was decided that liquor in a public warehouse was not in possession of the owner of the liquor and that, therefore, its removal from the warehouse was a transportation of it within the United States from one place to another. The intention of the word was satisfied and the case is consistent with *Street* v. *Lincoln Safe Deposit Co.*

But in *United States* v. *Gudger,* 249 U. S. 373, it was decided that the *transportation* of liquor through a State was not *transportation* into it, within the meaning of a provision in the Post Office Appropriation Bill. To me the case is decisive of those at bar.

With the suggestion of it and the other cases in our minds, let us consider what meaning and purpose are to be assigned to the Eighteenth Amendment and the Volstead Act. It is certainly the first sense of every law that its field of operation is the country of its enactment. *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347. And this is true of the Eighteenth Amendment and the Volstead Act, and necessarily, they get their meaning

from the field and purpose of their operation—from the conditions which exist in that field or are designed to be established there. The transportation that they prohibit is transportation within that field—that is, the United States, and "for beverage purposes." The importance of the purposes suggests the emphasis of italics, and the Volstead Act is at pains to declare that it shall be construed " to the end that the use of intoxicating liquor as a beverage may be prevented."

The transportation and the purposes are, therefore, complements of each other and both must exist to fulfill the declared prohibition. Neither exists in the cases at bar—the transportation in neither is, in the sense of the Amendment and act, "within" the United States "for beverage purposes." In one it is through the United States, in the other transshipment in a port of the United States, and both under the direction and control of the revenue officers of the United States and for use in other countries than the United States. Not only, therefore, are the cases not within the prohibition of the Eighteenth Amendment or the Volstead Act, but they are directly within § 3005 of the Revised Statutes and the treaty with Great Britain. In the view of the court, however, the section and the treaty have been extinguished—superseded by a world-wide reform that cannot tolerate any aid by the United States to the offensive liquor.

" The Eighteenth Amendment," is the declaration, " meant a great revolution in the policy of this country " and did not timidly confine itself " to the use of intoxicants in this country." There is appeal in the declaration. It presents the attractive spectacle of a people too animated for reform to hesitate to make it as broad as the universe of humanity. One feels almost ashamed to utter a doubt of such a noble and moral cosmopolitanism, but the facts of the world must be adduced and what they dictate. They are the best answer to magnified sen-

timent. And the sentiment is magnified. The Amendment and the Volstead Act were not intended to direct the practices of the world. Such comprehensive purpose resides only in assertion and conjecture and rejects the admonitory restraint of § 3005, the treaty with Great Britain and the non-interfering deference that nations pay to the practices of one another.

If such mission had been the purpose it would have been eagerly avowed, not have been left to disputable inference. Zeal takes care to be explicit in purpose and it cannot be supposed that § 3005 and the treaty were unknown and their relation—harmony or conflict—with the new policy; and it must have been concluded that there was harmony, not conflict. The section and the treaty support the conclusion. The section permits all merchandise arriving at certain ports of the United States and destined for places in the adjacent British provinces, and arriving at certain ports and destined for places in Mexico, to be entered at the custom-house and conveyed in transit through the United States. In a sense, it has its complement in § 3006 which gives to merchandise of the United States the same facility of transportation through the British provinces or the Republic of Mexico.

The treaty (Article XXIX) provides a reciprocation of privileges. Merchandise arriving at ports in the United States and destined for British possessions in North America may be entered at the proper custom-house and conveyed in transit through the United States without payment of duties. A like privilege is given United States merchandise arriving at ports in the British possessions for transit through those possessions.

In other words, the treaty is an exchange of trade advantages—advantages not necessary to the commerce of either, but affording to that commerce a facility. And yet, it is said, that it is the object of the Eighteenth Amendment to take away that facility, and to take away

the transshipment of liquor in an American port from one British ship to another. This is the only accomplishment! What estimate can be put upon it? It takes away not a necessity of British commerce, as I have said, but a convenience to it, in disregard of a concession recognized by law and by a treaty. And upon what prompting? Universal reform? If so why was the Panama Canal given up as a convenience to the prohibited beverage and apparently with purposeful care? There is a perversion in one or the other of those actions that needs to be accounted for. There seems to be a misunderstanding of their respective effects, an overlooking of their antagonism, if the purpose of our legislation be a reversal of things not only in the United States but elsewhere. To deny the distribution of intoxicants by forbidding them transit through the United States and affording them distribution through the Panama Canal cannot both be conducive to the world-wide reform which the court considers was the mission instituted by the Eighteenth Amendment and put in execution by the Volstead Act.

It is said, however, that regarding the United States alone, the Amendment and the act have a practical concern. If liquor be admitted for transit, is the declaration, some may stay for consumption. The apprehension is serious—not of itself but because of its implication. It presents the United States in an invidious light. Is it possible that its sovereignty, and what it can command, cannot protect a train of cars in transit from the Canadian border to the Mexican border or the removal of liquors from one ship to another from the stealthy invasions of inordinate appetites or the daring cupidity of bootleggers? But granting that the care of the Government may relax, or its watchfulness may be evaded, is it possible that such occasional occurrences, such petty pilferings, can so determine the policy of the country as to justify the re-

peal of an act of Congress, and violation or abrogation of a treaty obligation, by implication?

I put my dissent upon the inherent improbability of such intention—not because it takes a facility from intoxicating liquor but because of its evil and invidious precedent, and this at a time when the nations of the earth are assembling in leagues and conferences to assure one another that diplomacy is not deceit and that there is a security in the declaration of treaties, not only against material aggression but against infidelity to engagements when interest tempts or some purpose antagonizes. Indeed I may say there is a growing aspiration that the time will come when nations will not do as they please and bid their wills avouch it.

I think the judgment in No. 615 should be affirmed and that in No. 639 reversed.